**Dr. Raj P. SONI, Plaintiff-Appellee,**

v.

**BOARD OF TRUSTEES OF the UNIVERSITY OF TENNESSEE et al., Defendants-Appellants.**

No. 74–1602.

United States Court of Appeals, Sixth Circuit.

March 12, 1975.

As Amended on Denial of Rehearing June 5, 1975.

348

Ronald C. Leadbetter, Knoxville, Tenn., for defendants-appellants.

L. Caesar Stair, III, Bernstein, Dougherty & Susano, Knoxville, Tenn., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, EDWARDS, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

PHILLIPS, Chief Judge.

Dr. Raj P. Soni, a mathematics professor at the University of Tennessee, filed a complaint in the District Court alleging that he was denied procedural due process when the University failed to renew his teaching contract without giving him adequate notice or a hearing. District Judge Robert L. Taylor, sitting without a jury, held that Dr. Soni was entitled to a due process hearing and to back pay from the date of contract termination until the University provided such a hearing. Judge Taylor's opinion is reported at 376 F.Supp. 289 (E.D.Tenn. 1974). The University appeals. We affirm.

Jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1343(3).

Dr. Soni was born and reared in India. He attended an Indian university from which he received a Bachelor of Arts degree and a Master of Arts degree in mathematics. For several years Dr. Soni taught mathematics at the college level in India, and in 1959 he came to the United States to obtain his Ph.D. degree in mathematics from Oregon State University, which he received in 1963.

In September 1967, Dr. Soni joined the Mathematics Department of the University of Tennessee as a Visiting Associate Professor. At this time, Dr. Soni's teaching experience at the college level included six years as an instructor in India and one year as an Associate Professor at Oregon State University.

On several occasions during the 1967–1968 school year, Dr. Soni discussed with the then head of the Department of Mathematics, Professor John H. Barrett, the question of his being granted a permanent position at the University. At that time Dr. Soni was concerned about the permanency of his job status with the University and was interested in having a decision made one way or the other. As a result of these discussions, it was agreed between Dr. Soni and Professor Barrett that his visiting appointment would be extended for the 1968–1969 school year, and that a decision about a permanent appointment would be made in the fall of 1968.

On October 3, 1968, Professor Barrett issued "A recommendation for consideration by Professors and Associate Professors (with tenure)" regarding Dr. Soni and his wife, Mrs. Kusum Soni:

I recommend that Professor Raj Soni be offered an Associate Professorship with tenure.

. . . . .

Shortly after he arrived, he and I agreed that a two-year visiting position would be appropriate and that during this time we would consider him for a permanent position.

. . . . .

Since it is not possible for two people in the same family to have tenure in the same department, there is no question of tenure for Mrs. Soni. However, I recommend that we express our intention to keep her on the staff permanently.

Later that month Dr. Donald J. Dessart, who was appointed Acting Head of the Department of Mathematics when Professor Barrett became ill, called a special meeting of the Department's tenured faculty solely to consider approving Dr. Soni for a permanent appointment. At the meeting on October 29, 1968, Professor Dessart summarized the contents of Professor Barrett's memorandum recommending tenure for Dr. Soni. During the ensuing discussion, Professor Dessart pointed out that Dr. Soni was not a citizen of the United States and, consequently, could not be appointed formally to a permanent position in view of a University regulation and a state law, T.C.A. § 49–1308, quoted in footnote 1, providing that although aliens could be appointed to temporary positions at the University, they could not receive permanent appointments.

Because of the state law, the University regulation, and Dr. Soni's foreign citizenship, no formal vote was taken at the meeting on appointing Dr. Soni to a permanent faculty position with the University. Instead, Dr. Soni was changed from a Visiting Associate Professor to an Associate Professor for the 1969–1970 school year. Immediately following the special meeting, Dr. Soni was congratulated by those faculty members who had attended and was assured by his colleagues that the action taken at the meeting had been favorable.

Shortly thereafter, Dr. Soni received a letter dated October 29 from Professor Dessart stating in part as follows:

[I]t was recommended that you be appointed an associate professor without tenure . . . .. The question of recommending tenure will be considered by a similar departmental group at the time you become a citizen of the United States. In addition, it was recommended that you receive the full benefits of participation in TIAA/CREF at the first feasible opportunity . . ..

The TIAA/CREF is a financial retirement program at the University that was restricted at that time to "permanent type personnel."

In contrast to the congratulations of his colleagues, the October 29 letter seemed unfavorable and indefinite to Dr. Soni, and accordingly he sought out Professor Dessart for an explanation. Professor Dessart informed Dr. Soni that state law prohibited a grant of tenure to aliens, but he also gave assurances that the meeting in fact had been favorable, that the faculty wanted Dr. Soni to stay at the University, and that Dr. Soni's prospects with the University were good. According to Dr. Soni, he also was told that he would be treated like any other tenured professor.

Satisfied that his nontenured status was a matter of form necessitated by a technical state law, Dr. Soni purchased a home in the Knoxville area and stopped looking for employment elsewhere. He continued teaching at the University through the 1971–1972 school year, and on December 15, 1971, he became a naturalized United States citizen. During this time Dr. Soni was given no reason to believe that he was not a permanent member of the faculty. As stated above, Dr. Soni was permitted to participate in the University retirement program, which was ordinarily available only to permanent personnel. He attended departmental meetings and voted on tenure for other teachers, and he received further verbal assurances from his colleagues.

On March 8, 1972, however, Dr. Soni was notified that his appointment would be terminated as of August 31, 1973, because his performance as a teacher and as a research mathematician had "not been of the quality we expect of our tenured staff."

He was never granted a due process hearing as provided by the University's tenure policy. This policy statement is made Appendix A to this opinion.

### 1) Reasonable Expectation of Continued Employment

Judge Taylor found as a fact that despite Dr. Soni's awareness of the disqualifying statute,[1] "there existed sufficient objective evidence to vest in plaintiff a cognizable property interest in the form of a reasonable expectation of future and continued employment," 376 F.Supp. at 292, within the meaning of Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

The District Court further held that the University "objectively acted toward plaintiff in such a manner as to reasonably lead him to believe that he was a person with a relative degree of permanency in the academic community of this University. Upon acquiring this property interest, it cannot be terminated without procedural due process." 376 F.Supp. at 292.

■ On the record before us, these findings cannot be held clearly erroneous, but to the contrary are supported by substantial evidence. Based on his findings, Judge Taylor correctly concluded that Dr. Soni's employment could not be

---

1. This statute, T.C.A. § 49–1303, provides in part as follows:

> *49–1303. Aliens as teachers—Advocating overthrow of government.*—It shall be unlawful for the trustees of the University of Tennessee, the state board of education, or any local board of education, or any other person to employ any superintendent, principal, teacher, tutor, supervisor, or other person to have in any way the custody and care of students of the public educational institutions of this state who is not a citizen of the United States of America; provided that nothing in this section shall

> be construed to prohibit arrangements whereby professors and teachers who are citizens of other nations may be employed on a temporary basis on the faculties of colleges, universities or public schools in Tennessee . . ..

The District Court did not pass on the constitutionality of this statute, and the issue is not before us now. We simply note that the validity of § 49–1303 is open to question. *See* Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973).

terminated without notice and a hearing before an appropriate tribunal.

■ Appellants contend, however, that Dr. Soni could not have acquired a reasonable expectation of continued employment because the University of Tennessee had a well-established tenure system that would have prevented any expectancy from arising in a professor who had not been granted formal tenured status. We do not find this argument convincing. The Supreme Court has stated that a legitimate expectancy of continued employment "is particularly likely in a college or university . . . that has no explicit tenure system even for senior members of its faculty, but that nonetheless may have created such a system in practice." Perry v. Sindermann, 408 U.S. 593, 602, 92 S.Ct. 2694, 2700 (1972). The Court did not say, as it easily could have, that a reasonable expectancy can not arise in the context of a formal tenure system. The existence of such a system is but one factor for the trial court to consider in analyzing the due process claim of a formally nontenured professor.

In this case, we believe that Judge Taylor properly considered all of the circumstances of the employment relationship and correctly concluded that Dr. Soni "had a viable understanding that his employment would continue on a permanent basis with the Department of Mathematics, notwithstanding the statement contained in the October 29 correspondence that [Dr. Soni's] position was one without tenure." 376 F.Supp. at 292.

### 2) Award of Back Pay

Judge Taylor held that Dr. Soni is entitled to back pay from August 31, 1973 until the University completes a due process hearing meeting the requirements set forth in his opinion. 376 F.Supp. at 293. The University contends that this award violates the eleventh amendment and must be reversed under Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

■ The eleventh amendment, which has remained unchanged since its ratification was announced formally to the Congress in 1798, provides as follows:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

Thus we are faced with the threshold question of whether this action against the University of Tennessee is a suit against the State within the meaning of the amendment. It is well established that even though a state is not named a party to an action, the eleventh amendment still may bar the action if it seeks "to impose a liability which must be paid from public funds in the state treasury . . . .." Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347 (1974).

The educational institution now known as the University of Tennessee was incorporated by the General Assembly of Tennessee by Chapter 64 of the Acts of 1807 (Scott's Revision, Vol. 1, 1047 (1820)).[2] The original charter provides that "The said trustees and their successors by the name aforesaid, may sue and be sued, plead and be impleaded, in any court of law or equity in this State or elswhere."

The University is managed and controlled by the Board of Trustees, whose members include the Governor, the Commissioners of Agriculture and of Education, the President of the University, the Executive Director of the Higher Education Commission, and seventeen other members appointed by the Governor and subject to confirmation by the Tennessee Senate. T.C.A. §§ 49–3301 to –3303. The Board is empowered to borrow money and to issue bonds, which do not thereby become obligations of the State of Tennessee. T.C.A. §§ 49–3501 to –3510. The University receives income from many sources in addition to the substantial annual appropriations from the Tennessee Legislature.

---

**2.** This charter was amended as recently as 1971. Ch. 352, Public Acts of 1971.

In University of Tennessee v. Peoples Bank, 157 Tenn. 87, 6 S.W.2d 328 (1928), the Supreme Court of Tennessee held that a claim of the University was entitled to preference in a receivership proceeding for the liquidation of an insolvent bank. The Supreme Court said:

We are of the opinion that the state, and the public represented by it, must be considered as the owner of property held by the University, and that the sovereign character of the state's ownership is not changed by the creation of the corporation as a convenient means through which the state exercises the strictly governmental function of educating the youth among its citizens. We are not able to find that the state has lost or divested itself of any element of sovereignty in the creation of this corporation which is subject to the will of the legislative branch of the state government in every particular, and the only purpose of which is to perform a governmental function. Id. at 95, 6 S.W.2d at 330.

We have been unable to find any case discussing the University's status under the eleventh amendment. There are, however, many federal cases from other circuits holding other state colleges and universities to be state instrumentalities that enjoy the protection of the eleventh amendment. See, e. g., Brennan v. University of Kansas, 451 F.2d 1287, 1290 (10th Cir. 1971); Williams v. Eaton, 443 F.2d 422, 427–28 (10th Cir. 1971) (University of Wyoming); Walstad v. University of Minnesota Hosps., 442 F.2d 634, 641–42 (8th Cir. 1971); Board of Trustees of Arkansas A & M College v. Davis, 396 F.2d 730 (8th Cir.), cert. denied, 393 U.S. 962, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968); Hamilton Mfg. Co. v. Trustees of State Colleges in Colorado, 356 F.2d 599 (10th Cir. 1966); Scott v. Board of Supervisors of Louisiana State University, 336 F.2d 557 (5th Cir. 1964); Board of Regents of the University of Nebraska v. Dawes, 370 F.Supp. 1190 (D.Neb.1974). In addition, two district courts in this circuit have reached essentially the same conclusion. Depperman v. University of Kentucky, 371 F.Supp. 73, 77 (E.D.Ky.1974); Huckins v. Board of Regents of University of Michigan, 263 F.Supp. 622 (E.D.Mich.1967).

■ This line of authority, of course, does not control the present case. Each state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances. For example, in the Walstad and Scott cases, supra, the state constitutions apparently contained provisions specifically extending state immunities to the universities. No such provision appears in the Tennessee Constitution. In addition, a federal district court recently scrutinized three state-related universities and concluded that they were not state instrumentalities. Samuel v. University of Pittsburgh, 375 F.Supp. 1119 (W.D.Pa.1974), appeal dismissed for want of an appealable order, 506 F.2d 355 (3d Cir. 1974) (University of Pittsburgh, Temple University, Pennsylvania State University).

We are uncertain whether the University of Tennessee is a state instrumentality protected by the eleventh amendment. The record before us contains little data on the University's financial relationship with the State of Tennessee, and the Tennessee cases and statutory materials do not compel a conclusion one way or the other.

■ Assuming, without deciding, that this action is a suit against the State within the meaning of the eleventh amendment, we believe that Tennessee has waived the immunity by consenting to suits against the University of Tennessee. As noted above, the University's original charter provides that it may "sue and be sued, plead and be impleaded, in any court of law or equity in this State or elsewhere." We are not unmindful that a waiver of a constitutional right must appear clearly and may not be lightly inferred. Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347 (1974). For example, it seems generally agreed that a state's consent to be sued in its own courts does not necessarily imply consent to be sued in federal court. See Williams v. Eaton, 443 F.2d

422, 428 (10th Cir. 1971); Scott v. Board of Supervisors of Louisiana State University, 336 F.2d 557, 558 (5th Cir. 1964). We are also aware that when a "public instrumentality is created with the right 'to sue and be sued' that waiver of immunity in the particular setting may be restricted to suits or proceedings of a special character in the state, not the federal courts." Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275, 277, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959); *see* Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 465–66 & n.8, 65 S.Ct. 347, 89 L.Ed. 389 (1945); Board of Regents of the University of Nebraska v. Dawes, 370 F.Supp. 1190, 1193 (D.Neb. 1974).

■ In this case, however, the University of Tennessee was created, only a few years after the ratification of the eleventh amendment, with the unrestricted right to sue and to be sued "in any court of law or equity." We see no indication that this sweeping consent was intended to be limited to suits brought in the state courts. To the contrary, by its terms the consent is general and purports to apply to any court and to any type of suit.

Article 1, § 17 of the Constitution of Tennessee provides that "Suits may be brought against the State in such manner and in such courts as the Legislature may by law direct." This language originated with the State's first Constitution of 1796 and was carried forward into the Constitutions of 1834 and 1870. The Legislature of Tennessee has consented that the University may sue and be sued.

The power to sue grants to the University the right to recover a money judgment. Consent to be sued inescapably subjects the University to the hazard of having a money judgment rendered against it.

We, therefore, conclude that the eleventh amendment does not bar the money judgment against the University in this case.

Accordingly, the judgment of the District Court is affirmed. The costs of this appeal are taxed against the University of Tennessee.

### APPENDIX A

Tenure Policy

After the expiration of a probationary period, teachers or investigators should have permanent or continuous tenure,[1] and their services should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of bona fide financial necessities of the University. The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated.

Beginning with appointment to the rank of full-time Instructor or a higher rank, the probationary period should not exceed seven years, including within this period full-time service in all institutions of higher education; but subject to the proviso that when, after a term of probationary service of more than three years in one or more institutions, a

---

1. Granting of tenure is an expression of confidence in the integrity and worth of an individual teacher, scholar, or teacher-scholar. Tenure is a code word which may be expanded into a statement. It says something of this sort: "You have performed well and responsibly here (or elsewhere; or here and elsewhere) over a period of time. We have need for your services now and will continue to need them for many years to come. We believe that you will continue henceforward to perform well and responsibly. So that you may be free from concern over retaining your position, we guarantee that so long as you want to stay and so long as you continue to perform well and responsibly, you will have your place and will be eligible for promotions, increases in stipend, and any other rewards available to the tenure staff. We further guarantee that you are protected from the capricious exercise of administrative powers. Tenure can only guarantee the rank and salary (not always the salary if, for any reason, the University should suffer severe financial reverses) agreed upon at the time tenure is granted. And, of course under conditions described on pp. 20–22 of The Faculty Handbook, tenure insures use of proper procedures before a dismissal, but it does not insure against dismissal after proper procedures have been followed."

teacher is called to this institution it may be agreed in writing that his new appointment is for a probationary period of not more than four years, even though thereby the person's total probationary period in the academic profession is extended beyond the normal maximum of seven years. Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period. During the probationary period a teacher should have the freedom and responsibility that all other members of the faculty have.

Except in cases of gross incompetency, immorality or felony, where the facts are not in dispute, termination for cause of a continuous appointment or the dismissal for cause of a teacher previous to the expiration of a term appointment whether based on charges initiated by the Trustees, administration, or members of the faculty should be considered by a committee composed of representatives of both the faculty and the administration, with the right to all parties to have a re-examination of the case by the governing board of the institution. In all cases where the facts are in dispute, the accused teacher should, prior to the hearing, be informed in writing of the charges against him and should have the opportunity to be heard in his own defense by all bodies that pass judgment upon his case. He should be permitted to have with him an adviser of his own choosing who may act as counsel. There should be a full stenographic record of the hearing available to the parties concerned. In the hearing of charges of incompetence, the testimony should include that of teachers and other scholars.

The administration may for grave cause suspend an accused faculty member pending immediate investigation and speedy hearing, or, on recommendation of the faculty and administration committee, the administration may suspend a faculty member for cause. In any case of suspension the accused faculty member should suffer no loss of salary unless he is adjudged guilty and his appointment is terminated, in which event the committee, subject to the approval of this Board, will determine the date of termination.

## Administrative Procedures Relative to Tenure

1. All initial appointments shall be without *tenure* unless the letter of appointment states otherwise. Ordinarily, tenure will be considered after completion of a probationary period of not more than three years for a person in the rank of Assistant Professor, and may be considered after one year for persons in the ranks of Associate Professor or Professor. (A full-time Instructor may be placed on tenure upon the recommendation of the department head and dean of the college and when approved in writing by the Academic Vice Chancellor. Instructors usually serve a probationary period without tenure not to exceed seven years.)

2. Proposals to bestow tenure, either at the time of a first appointment or subsequently, shall be the responsibility of those who initiate recommendations for academic promotions.

3. If tenure has not been specified in the appointment letter, the change from a non-tenure to a tenure status shall be accomplished through the processing of a Personnel Change of Status Form followed by appropriate notification from the dean of the college to the person involved.

From the Minutes of the Annual Meeting of the Board of Trustees of the University of Tennessee, Nov. 4, 1955, as revised in 1966 and in 1970.