822 F.2d 1303
 40 Ed. Law Rep. 660
 Gabor G. KOVATS, Steven C. Procuniar, Joy L. Davis, Roberta
M. Delson, Hace Tishler, and Anna Beck
v.
RUTGERS, THE STATE UNIVERSITY, Board of Governors of
Rutgers, The State University, Edward Bloustein, as
President of Rutgers, The State University and individually
and John R. Martin, as Vice-President for Personnel of
Rutgers, The State University and individually; and Susan
A. Cole, as Vice-President for Personnel of Rutgers, The
State University.
Appeal of RUTGERS, THE STATE UNIVERSITY; Board of Governors
of Rutgers, The State University; Edward Bloustein; as
President of Rutgers, the State University and Individually,
and John R. Martin, as Vice-President for Personnel of
Rutgers, The State University and Individually.
Margaret VARMA, on behalf of herself and all others
similarly situated; and Rutgers Council of AAUP Chapters
v.
Edward J. BLOUSTEIN; President of Rutgers, The State
University, T. Alexander Pond; Executive Vice-President and
Chief Academic Officer of Rutgers, The State University;
Norman Samuels; Provost of the Newark Campus of Rutgers,
The State University; James Young; Former Provost of the
Newark Campus of Rutgers, The State University; Walter
Gordon; Provost of the Camden Campus of Rutgers, The State
University; Kenneth Wheeler; Provost of the New Brunswick
Campus of Rutgers, The State University; Jean Parrish;
Acting Provost of the New Brunswick Campus of Rutgers, The
State University; Professors Hans Fisher, Noemie Killer,
Richard Poirier, Paul Fussell, Lawrence Fisher, Jane
Scanlon, Harvey Feder and Amelie Rorty of Rutgers, The State
University; Susan A. Cole; Vice-President for Personnel at
Rutgers, The State University, Elizabeth Mitchell;
Assistant Vice-President for Faculty Affairs of Rutgers,
The State University; Robert Pack; Associate Provost for
Personnel, New Brunswick; Members of the Board of Governors
of Rutgers, The State University; Linda Stamato; Chair;
Donald Dickerson; Vice-Chair; Floyd Bragg; Sanford Jaffe;
Robert Kaplan; Harold Perl; Norman Reitman; Lawrence S.
Schwartz; and David Werblin, all individually and in their
corporate capacities and Rutgers, The State University the
Promotion Review Committee, of Rutgers, The State University.
Appeal of Edward J. BLOUSTEIN; T. Alexander Pond; Norman
Samuels; James Young; Walter Gordon; Kenneth Wheeler;
Jean Parrish; The Promotion Review Committee; Susan A.
Cole; Elizabeth Mitchell; Robert Pack; Linda Stamato;
Donald Dickerson; Floyd Bragg; Sanford Jaffee; Robert
Kaplan; Harold Perl; Norman Reitman; Lawrence S.
Schwartz; and David Werblin; and Rutgers, The State University.
 Nos. 86-5413, 86-5506, 86-5472 and 86-5673.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 18, 1987.
Decided June 30, 1987.
 
 John J. Peirano (argued), Linda B. Celauro, Carpenter, Bennett & Morrissey, Newark, N.J., for appellants.
 Denise Reinhardt (argued), Paul Schachter, Reinhardt & Schachter, Newark, N.J., for appellees.
 Before SLOVITER and MANSMANN, Circuit Judges, and SCIRICA, District Judge*.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 Issues Raised
 
 1
 This appeal arises from suits under 42 U.S.C. Sec. 1983 filed by two groups of present and former faculty members against Rutgers, whose official name is Rutgers, The State University, its Board of Governors, and certain Rutgers officials in their individual and official capacities.
 
 
 2
 In the suit hereafter referred to as Varma, Margaret Varma alleges that she was denied tenure on the recommendation of the Promotions Review Committee, notwithstanding favorable recommendation by her department, the Appointment and Promotions Committee, and the Dean of her College.[1] Varma's complaint, as finally amended, alleges, inter alia, that the university and its officials refused to follow published tenure standards, and instead based denials of tenure on "secret and undisclosed standards of performance and of review, never communicated to the candidates," and gave negative tenure recommendations based both "on a refusal to accord due respect and weight to scholarship and activities in areas of concern to ... women, non-white people, workers, impoverished people and others traditionally excluded from full participation in the life of this society" and "on the fact that the candidate's assigned duties and their agreed-upon weights differ from the usual emphasis on classroom teaching and conventional scholarship." VA at 88-89. The complaint alleges that these acts have deprived faculty members of their rights to due process, equal protection and freedom of speech in violation of the United States Constitution, the New Jersey Constitution and 42 U.S.C. Sec. 1983. The complaint, filed as a class action, seeks a declaration of rights, an injunction governing future promotions, reinstatement and equitable back pay for Varma and other class members, compensatory and punitive damages and costs and attorney's fees.
 
 
 3
 In the suit hereafter referred to as Kovats, Gabor G. Kovats, Hace Tishler, Anna Beck, Steven C. Procuniar, Joy L. Davis and Roberta M. Delson alleged that they were discharged from their faculty positions and were denied tenure, despite their service for more than seven years prior to discharge which they allege gives them de facto tenure.[2] The faculty members alleged that their terminations deprived them of their property rights to tenure in violation of the Due Process Clause of the United States Constitution, the New Jersey Constitution, and 42 U.S.C. Sec. 1983.[3]
 
 
 4
 In both actions, Rutgers and its officials in their official capacities moved for summary judgment on the basis of a claimed Eleventh Amendment immunity from suit. The officials in their individual capacities moved for summary judgment on the basis of a claimed qualified immunity. The district courts denied all summary judgment motions, Kovats v. Rutgers, 633 F.Supp. 1469 (D.N.J.1986); Varma v. Bloustein, No. 84-2332 (D.N.J. Jun. 9, 1986), VA at 449, but certified their orders for interlocutory appeal because of the importance of the questions of law addressed. The defendants appeal. We have jurisdiction over both issues under 28 U.S.C. Sec. 1292(b). Denial of qualified immunity is also a collateral order subject to immediate appeal. Mitchell v. Forsyth, 472 U.S. 511, 524-30, 105 S.Ct. 2806, 2815-17, 86 L.Ed.2d 411 (1985). Our review is plenary.
 
 
 5
 The appeals raise two issues. First, is Rutgers an arm of the state such that it, and derivatively its officials in their official capacities, is entitled to Eleventh Amendment immunity from suit in federal court? Second, are Rutgers' officials in their individual capacities entitled to qualified immunity?
 
 II.
 Eleventh Amendment Immunity
 
 6
 a. The Standard
 
 
 7
 Rutgers contests the district courts' denial of Eleventh Amendment immunity to Rutgers; two of Rutgers' official bodies, the Board of Governors and the Promotion Review Committee; and Rutgers' officials in their official capacity. Any Eleventh Amendment immunity granted the official bodies or the officers would be derivative from the immunity of Rutgers itself, see Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101-02, 104 S.Ct. 900, 908-09, 79 L.Ed.2d 67 (1984), and, therefore, if Rutgers is not entitled to Eleventh Amendment immunity, neither are its official bodies and its officers in their official capacities.
 
 
 8
 The language of the Eleventh Amendment extends only to the state itself,[4] but the Supreme Court has held that it bars actions in federal court when "the state is the real, substantial party in interest." Pennhurst, 465 U.S. at 101, 104 S.Ct. at 908 (citations omitted).
 
 
 9
 In Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977), the Court stated that whether an entity was an arm of the state as opposed to a non-immune municipal corporation depended "at least in part, upon the nature of the entity created by state law." It concluded that even though a city Board of Education received state funding, because Ohio law defined a local school district as a political subdivision separate from the state and granted the Board the power to raise its own money, the Board could not be considered an arm of the state entitled to Eleventh Amendment immunity. Id. at 280-81, 97 S.Ct. at 572-73.
 
 
 10
 Similarly, in Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979), the Court held that in order for the interstate Regional Planning Authority (RPA), an entity created by interstate compact, to enjoy Eleventh Amendment immunity, it must be an arm of the compacting states rather than a body "comparable to a county or municipality." Further, there must be "good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States themselves." Id. The Court looked to the facts that the states had disclaimed immunity, had made funding the responsibility of counties, had declared judgments against the agency to be non-binding on the state, had allowed counties to appoint a majority of agency members, and had given the agency traditionally local functions in concluding that the RPA was not an arm of the state entitled to Eleventh Amendment immunity. Id. at 401-02, 99 S.Ct. at 1177.
 
 
 11
 In this court, we have incorporated the six factors outlined by the Supreme Court in Lake Country Estates into a nine factor inquiry to be examined to determine when an entity should be regarded as entitled to share in the state's Eleventh Amendment immunity:
 
 
 12
 [L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations.
 
 
 13
 Urbano v. Board of Managers of the New Jersey State Prison, 415 F.2d 247, 250-51 (3d Cir.1969), cert. denied, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970); see also Port Authority Police Benevolent Association, Inc. v. Port Authority of New York and New Jersey, 819 F.2d 413, 417-18 (3d Cir.1987); Skehan v. State System of Higher Education, 815 F.2d 244, 247 (3d Cir.1987); Blake v. Kline, 612 F.2d 718, 722 (3d Cir.1979), cert. denied, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980). We proceed to consider these criteria as they apply to Rutgers.[5]b. Funding
 
 
 14
 The primary dispute in the instant case involves the funds from which a judgment against Rutgers must be paid. The affidavits[6] establish that Rutgers has four distinct sources of income: auxiliary income derived from Rutgers' auxiliary services and restricted to use in funding those services which include dining services, room rentals and intercollegiate athletic programs; restricted income from moneys received from private or government groups and limited to use in the specific program generating the funds; general university income from tuition, fees, and investments; and state appropriations. Greenberg Affidavit, KA at 342-43. General university income and state appropriations make up approximately 72 percent of Rutgers' total income and are commingled in a general operating account which funds separate accounts used in running Rutgers' day to day operations. Greenberg Affidavit, KA at 343, 345. Somewhere between 50 and 70 percent of the general operating account is made up of state appropriations. Lettieri Affidavit, KA at 474-80. It is from this account consisting of commingled state and university funds that Rutgers would ordinarily pay a judgment entered against it in these cases. Greenberg Affidavit, KA at 344-45.
 
 
 15
 Rutgers relies on Hall v. Medical College of Ohio at Toledo, 742 F.2d 299 (6th Cir.1984), cert. denied, 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985), for the proposition that payment out of such a commingled account "has the effect of making any judgment against the school a liability payable from the state treasury." Id. at 305. In Hall, however, more significant than commingling was the state's ability to require that the non-state funds (tuition and fees and revenues from hospital operation) be paid to the state and reappropriated for use as state funds. Id. at 304. Thus, none of the funds in the commingled accounts were free from state control. Moreover, the college had no ability to raise funds free from state control. Title to property held by the college was "taken in the name of the State of Ohio." Id. The college could issue bonds to raise funds, but both "the issuance of such bonds and the use of the proceeds thereof [were] regulated by the legislature in great detail." Id. In Port Authority Police, where we concluded that payment by a self-supporting Authority from a fund made up of surplus revenues was considered to be funded by the state, it was particularly significant that the "uses to which the money from the Authority's General Reserve Fund may be put are strictly circumscribed by periodic legislation." Port Authority Police, 819 F.2d at 416.
 
 
 16
 We have suggested that relief should not be viewed as coming from the state where an entity has the ability to pay a judgment from private funds not subject to state control. In Blake v. Kline, 612 F.2d at 723, we noted that by statute the Public School Employees' Retirement Board (PSERB) of Pennsylvania received funds from the state, employers, employees and its own investments. PSERB funds were set aside in two separate accounts in the state treasury under administration of the state treasurer at the direction of PSERB. One account was reserved for payment of employee benefits and was guaranteed by the state; the other served as a general fund for PSERB use. We held it was not dispositive for the Eleventh Amendment inquiry that the state contributed a majority of PSERB funds, either directly as PSERB funding or indirectly as an employer. Id. at 724. Instead, we remanded for consideration whether PSERB's segregated general fund would be sufficient to pay the judgment and whether the state treasurer's control over PSERB's funds was discretionary or simply ministerial. Id.
 
 
 17
 Here, unlike Hall, the affidavits and deposition testimony demonstrate that Rutgers has substantial amounts of non-state funds in both commingled and segregated accounts out of which a judgment can be paid. Rutgers' Board of Trustees holds title to land and buildings worth more than $40 million. Reinhardt Affidavit, KA at 431. Though this property is impressed to a public trust administered by the Trustees, NJSA 18A:65-2,-26, the income from the Trustees' assets is turned over to Rutgers' Board of Governors and forms a portion of the commingled operating funds from which judgments may be paid. NJSA 18A:65-26(2); Greenberg Affidavit, KA at 343-45. Deposition testimony by Joseph Whiteside, Rutgers' financial manager, demonstrates the existence of segregated accounts held in Rutgers' name consisting solely of interest income from Rutgers' assets and available for discretionary use by Rutgers' Board of Governors. Kovats, 633 F.Supp. at 1474. Between 1983 and 1985 Rutgers used from $44 to $48 million in auxiliary non-state income as a pledge to bondholders. Lettieri Affidavit, KA at 475, 477-78.
 
 
 18
 Under the applicable statute Rutgers retains sole discretionary control over both its commingled and segregated accounts, subject only to audit by the state. NJSA 18A:65-25(d). Unlike the situation in Blake, where PSERB funds were required to be held in accounts managed by the state treasurer, Rutgers, unlike other New Jersey state agencies, is not required to manage its funds as public moneys but rather maintains its own accounts. NJSA 18A:65-25(c), (d), (g). Compare NJSA 52: 18-31, -16.1, -20 (requirements for state management of some public moneys). Thus, a judgment against Rutgers can be paid from non-state funds under Rutgers' discretionary control.
 
 
 19
 Rutgers contends that even a payment from non-state funds will result in indirect payment from the state treasury because of necessary increases in state budget appropriations to make up shortfalls caused by payment of judgments. According to an affidavit, Rutgers' projection of spending needs offset by its projected non-state income is factored into New Jersey's preparation of its annual appropriation to Rutgers. Greenberg Affidavit, KA at 345-49; see also Kovats, 633 F.Supp. at 1475; Miller, 619 F.Supp. at 1389-90. In this sense, as the district court noted, "a diminution in sources available for educational purposes may be reflected annually through larger appropriations. In other words, payment of retroactive damage awards may be made up by increased state funding." 633 F.Supp. at 1475.
 
 
 20
 In Port Authority Police, we held the authority was entitled to immunity at least in part because the governing statute provided "[u]nless ... the revenues from operations conducted by the port authority are adequate to meet all expenditures, the legislatures of the two states shall appropriate [the amounts needed]." Port Authority Police, 819 F.2d at 416 (quoting N.Y. Unconsol. Laws Sec. 6416 (McKinney 1979) ) (emphasis added). Here, however, in the statute governing Rutgers, New Jersey has twice explicitly insulated itself from any liability on obligations running against Rutgers. NJSA 18A:65-8, 65-25(e). Any increase in Rutgers' state appropriation as a result of a judgment against Rutgers will be entirely the result of discretionary action by the state.
 
 
 21
 Rutgers argues that it would be anomalous if the state "must pay the cost of losing its Eleventh Amendment immunity to suit because it permits its university to meet some of its operating expenses by the use of whatever non-state funds it can muster." Appellants' Brief at 27. The plaintiffs counter by arguing that granting immunity based on discretionary funding would be contrary to the generally accepted denial of immunity to municipalities, including those which receive funding from the state. See Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because funding alone is not dispositive of the immunity issue, those arguments miss the point. As this court stated in Blake, "The issue of whether payment is from the state treasury or from PSERB funds, although important, is not dispositive. It is only meaningful in light of the agency's other attributes." 612 F.2d at 724. If the state structures an entity in such a way that the other relevant criteria indicate it to be an arm of the state, then immunity may be retained even where damage awards are funded by the state at the state's discretion.[7]
 
 
 22
 c. Status Under State Law
 
 
 23
 On the one hand, as the district court in Miller stated, "the University is an instrumentality of the state. Both the statute under which Rutgers is incorporated and case law expressly so state." 619 F.Supp. at 1389. The 1956 statute establishing Rutgers as the state university created Rutgers as a corporation which "is the instrumentality of the state for the purpose of operating the state university." NJSA 18A:65-2. New Jersey court decisions have treated Rutgers as the "alter ego of the State" and as a "full-fledged state agency." Rutgers, The State University v. Piluso, 60 N.J. 142, 158-59, 286 A.2d 697, 705 (1972) (holding Rutgers immune from local zoning ordinances); Trustees of Rutgers College v. Richman, 41 N.J.Super. 259, 298, 125 A.2d 10, 31 (Ch. Div. 1956). In addition, Rutgers' primary purpose is the provision of higher education. NJSA 18A:65-2. We have stated that "[p]roviding education has long been recognized as a function of state government." Skehan, 815 F.2d at 248. See also Miller, 619 F.Supp. at 1391; Handsome v. Rutgers, 445 F.Supp. 1362, 1367 n. 7 (D.N.J.1978). Rutgers is therefore distinguishable from state related entities which perform only proprietary functions.
 
 
 24
 On the other hand, Rutgers is not treated as synonymous with the state for other purposes. For example, Rutgers is not considered a part of the state for purposes of the New Jersey Contractual Liability Act, see NJSA 59:13-2, since Rutgers is entitled to sue or be sued and the statute excludes such entities from the definition of "state". See Frank Briscoe Co. v. Rutgers, The State University, 130 N.J. Super. 493, 506, 327 A.2d 687, 694 (Law Div. 1974).[8] Rutgers is also, unlike other state agencies, not subject to civil service laws, NJSA 18A:65-25(i) (granting Rutgers full control over personnel subject only to compliance with budget requirements); competitive bidding statutes, see Rutgers, The State University v. Kugler, 110 N.J. Super. 424, 434, 265 A.2d 847, 853 (Law Div. 1970); or administrative procedure requirements, NJSA 52:14B-2 (definition of state agency for purposes of New Jersey Administrative Procedure Act inapplicable to Rutgers).
 
 
 25
 d. Suits and Immunities
 
 
 26
 Prior to the 1956 act establishing Rutgers as the state university, Rutgers was a private entity with the power to sue and be sued. The 1956 act left Rutgers a separate corporation, NJSA 18A:65-2, and did not explicitly remove that power. As a result, Rutgers remains able to sue and be sued in state court. See Frank Briscoe, 130 N.J. Super. at 499-506, 327 A.2d at 690-94. The state has immunized itself from liability on judgments entered against Rutgers. NJSA 18A:65-8 ("No provision in this chapter contained shall be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit, of the state of New Jersey.")
 
 
 27
 Rutgers does, however, share in many of the state's immunities. As a public entity, Rutgers is subject to tort suits only under the provisions of New Jersey's tort claims act. NJSA 59:1-3 (comment). Rutgers' property, like that of the state, is immune from local zoning ordinances, see Rutgers v. Piluso, 60 N.J. at 158-59, 286 A.2d at 705, and has been held to be "property of the State of New Jersey" exempt from property taxes. Rutgers, the State University v. Piscataway Township, 1 N.J. Tax 164, 171 (1980).
 
 
 28
 e. Autonomy
 
 
 29
 Rutgers is largely autonomous and subject only to minimal state supervision and control. There are two governing bodies. One is the Board of Governors, which has eleven voting members of which a bare minimum, six, are appointed by the governor with the advice and consent of the senate; the remaining five are appointed by the trustees from among their members. NJSA 18A:65-14. The other is the Board of Trustees. Eleven trustees, the six appointed by the Governor to the Board of Governors and five others, are appointed by the governor with the advice and consent of the senate. NJSA 18A:65-15(I)(b). The remaining voting trustees consist of from twelve to twenty Rutgers alumni and alumnae chosen by the trustees, NJSA 18A:65-15(I)(c), and twenty five charter trustees chosen by the trustees to replace those trustees in office at the time of the statute's passage. NJSA 18A:65-15(I)(d).
 
 
 30
 Rutgers' dual governing structures evolved from Rutgers' history as a privately chartered institution made public by the 1956 statute. The trustees, who exercised sole control over Rutgers when it was a private institution, see Rutgers v. Piluso, 60 N.J. at 155, 286 A.2d at 703-04, have an "overall advisory capacity" and, so as not to violate the terms of the original charter, retain sole control subject to a public trust over the assets held by Rutgers prior to the 1956 act. See NJSA 18A:65-26. The governors exercise "general supervision over ... the conduct of the university." NJSA 18A:65-25. In running the university, the governors and trustees are "given a high degree of self-government." NJSA 18A:65-27(I)(a). In particular, the trustees retain the power to withdraw their assets if they feel that the assets are being put to improper use. NJSA 18A:65-27(II)(c). More generally, both boards may exercise their powers "without recourse or reference to any department or agency of the state, except as otherwise expressly provided by this chapter or other applicable statutes." NJSA 18A:65-28.
 
 
 31
 The state places two limitations on the boards' operation of the University. First, the governors must comply with the state's budget appropriations to the university. NJSA 18A:65-25(d), (h), (i). Second, the governors must comply with state laws and regulations. See NJSA 18A:65-34.
 
 
 32
 The state intervention produced by these limitations is minimal. Unlike some state agencies, Rutgers is not required to manage its funds as public moneys, but rather is free to establish accounts and invest and withdraw funds as desired. NJSA 18A:65-25(c), (d), (g). Compare NJSA 52:18-31 ("All moneys collected through the board of fish and game commissioners under any state fish and game law shall be deposited in the state treasury"); 52:18-32 (moneys received relating to motor vehicles "shall be deposited in the state treasury"); 52:18-16.1 (State Treasurer controls deposit of public moneys with interest going to the state); NJSA 52:18-20 (only State Treasurer may withdraw state funds).
 
 
 33
 Though the boards must direct expenditures "in accordance with the provisions of the State budget," within these broad constraints individual spending decisions are not regulated beyond a requirements that the state be informed of those spending decisions. See NJSA 18A:65-25(d); Greenberg Affidavit, App. at 349. Moreover, as noted above, the boards are not subject to the operational constraints placed on most other state agencies. For example, they need not comply with civil service, competitive bidding or administrative procedure requirements.
 
 
 34
 f. Conclusion
 
 
 35
 The majority of cases addressing the question of Eleventh Amendment immunity for public colleges and universities have found such institutions to be arms of their respective states and thus immune from suit. See Hall, 742 F.2d at 301-02 (citing cases). We have previously held Pennsylvania state colleges and the Pennsylvania State System of Higher Education entitled to immunity. Skehan v. State System of Higher Education, 815 F.2d at 249; Skehan v. Board of Trustees of Bloomsburg State College, 538 F.2d 53, 62 (3d Cir.) (in banc), cert. denied, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976). On the other hand, district courts in this circuit have held that the University of Delaware, Temple University, the University of Pittsburgh and Penn State University, although affiliated with their states in varying degrees, are not alter egos of those states and therefore do not share the states' Eleventh Amendment immunity. See Gordenstein v. University of Delaware, 381 F.Supp. 718, 722 (D.Del.1974); Samuel v. University of Pittsburgh, 375 F.Supp. 1119, 1125-28 (W.D.Pa.1974), aff'd in part, rev'd in part on other grounds, 538 F.2d 991 (3d Cir.1976) (applying not only to the University of Pittsburgh but also to Temple University and Penn State University). The decisions in other cases, while helpful in terms of analytic models, cannot govern our decision as to Rutgers because "[e]ach state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances." Soni v. Board of Trustees of the University of Tennessee, 513 F.2d 347, 352 (6th Cir.1975), cert. denied, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976); see also Hall, 742 F.2d at 302.[9]
 
 
 36
 Our examination of the circumstances surrounding Rutgers leads us to conclude that a majority of the relevant criteria weigh against considering Rutgers an arm of the state entitled to Eleventh Amendment immunity. Rutgers was originally a private institution. Though it is now, at least in part, a state created entity which serves a state purpose with a large degree of state financing, it remains under state law an independent entity able to direct its own actions and responsible on its own for judgments resulting from those actions.[10]
 
 III.
 Qualified Immunity
 
 37
 The second question raised by the district court's order pursuant to 28 U.S.C. Sec. 1292(b) is whether those defendants who are named in their individual capacities are entitled to qualified immunity.
 
 
 38
 The governing standard for qualified immunity has been described as follows:
 
 
 39
 [G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
 
 
 40
 Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 346 (1982); see also Malley v. Briggs, 475 U.S. 335, ----, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986); Davis v. Scherer, 468 U.S. 183, 190-91, 104 S.Ct. 3012, 3017 (1984). Officials claiming qualified immunity bear the burden of pleading and proof. See Harlow, 457 U.S. at 819, 102 S.Ct. at 2738; see also Skehan v. Board of Trustees of Bloomsburg State College, 538 F.2d at 61-62.
 
 
 41
 We have interpreted the "clearly established" language to mean that there must be "some but not precise factual correspondence" between applicable precedents and the case at issue, People of Three Mile Island v. Nuclear Regulatory Commissioners, 747 F.2d 139, 144-45 (3d Cir.1984), and that officials must apply "general, well developed legal principles." Id.; see also Sourbeer v. Robinson, 791 F.2d 1094, 1103 (3d Cir.1986); Hicks v. Feeney, 770 F.2d 375, 379-80 (3d Cir.1985).
 
 
 42
 In Kovats, where plaintiffs claim that they held a state defined property right in the form of de facto tenure acquired by virtue of length of service under University Regulation 60.1 which triggered a right to a hearing before their discharge, the Rutgers officials moved for summary judgment essentially on the ground that there is no "clearly established" law that the regulation grants de facto tenure. The court did not directly address that issue, which is the issue on which we remanded the case. Kovats v. Rutgers, 749 F.2d at 1049 ("On remand, the district court should address the property issue [whether the regulations create a property interest in tenure]"). Instead, the district court decided that because the Supreme Court in Perry v. Sindermann, 408 U.S. 593, 599-603, 92 S.Ct. 2694, 2698-2700, 33 L.Ed.2d 570 (1972) and its companion case, Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), held that university rules, policies, and understandings could give rise to a property interest in employment, the law was "clearly established at the time of plaintiffs' termination," the officials "should have related Perry and Roth to the instant situation," and therefore the officials had failed to show that they were "entitled to summary judgment on their qualified immunity defense." Kovats, 633 F.Supp. at 1478-79 (footnote omitted).
 
 
 43
 The Rutgers officials concede that were it clearly established that Rutgers' regulations provide for de facto tenure by length of service, they would not be entitled to qualified immunity because Perry and Roth established that faculty members with a property interest in their positions may not be terminated without due process of law. They claim, however, that it is not "clearly established" that University Regulation 60.1 provides de facto tenure.
 
 
 44
 They contend that unlike the college in Perry which had no formal procedures for obtaining tenure, the Rutgers' regulations provide for a formal process of tenure grants. They argue that because numerous cases have rejected claims for de facto tenure at universities with formal tenure systems, see Sabet v. Eastern Virginia Medical Authority, 775 F.2d 1266, 1269-70 (4th Cir.1985); Beitzell v. Jeffrey, 643 F.2d 870, 877 (1st Cir.1981); Davis v. Oregon State University, 591 F.2d 493, 496 (9th Cir.1979); Cusumano v. Ratchford, 507 F.2d 980, 984 (8th Cir.1974), cert. denied 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 46 (1975), the Kovats plaintiffs' alleged property right in de facto tenure by virtue of length of service was not "clearly established."
 
 
 45
 We agree that summary judgment on the qualified immunity issue was inappropriate at this time, but not precisely for the reason given by the district court. In this case, whether there was a violation of procedural due process will depend on whether there was any property right. If the regulation does not give plaintiffs de facto tenure, their case is over. Only if the court determines that they had de facto tenure would it be obliged to decide the qualified immunity defense.
 
 
 46
 In many cases, it may be possible to decide the qualified immunity question without reaching the merits and thereby avoid further proceedings. See Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). In the Kovats case, however, the legal issues are inextricably intertwined with the factual issues. The evidence relevant to a determination of whether the regulation can be read to give de facto tenure would also be relevant in determining whether the individual defendants should have known that plaintiffs were entitled to de facto tenure. Apparently, there has been no discovery on the factual issues relating to the merits. In this posture, summary judgment on this issue would have been premature.
 
 
 47
 The Varma claim does not appear to fit into due process analysis as neatly as does the Kovats claim. Varma, of course, does not contend that she ever received de facto tenure. Nor does she contend that she did not receive a hearing before she was denied tenure. She claims, instead, that she was not evaluated for tenure in accord with the governing standards and procedures for tenure evaluations. Varma's brief summarizes her claim as follows: "that university regulations conferred on [her] the legitimate expectation that published procedure and criteria for tenure evaluation would be followed."[11] Appellees' Brief at 70.
 
 
 48
 In denying summary judgment on the qualified immunity claim, the district court stated that Roth and Perry clearly established that "[p]roperty rights may arise out of the tenure process provided that the procedure under which the claim is asserted was intended to act as a significant and substantive restriction on the University's discretion." Varma v. Bloustein, No. 84-2332, slip op. at 10 (D.N.J. Jun. 9, 1986), VA at 447. The court found that Varma's claim implicated this clearly established law and, for that reason, denied Rutgers' motion for summary judgment on the qualified immunity issue.
 
 
 49
 The Rutgers individuals argue that what the district court should have addressed is whether it was clearly established that a candidate for promotion or tenure has a property interest in the standards and procedures used in evaluating a candidate. They rely on several cases which have held, after consideration on the merits, that specific university regulations governing criteria for promotion do not create property interests. See Lovelace v. Southeastern Massachusetts University, 793 F.2d 419, 422 (1st Cir.1986); Goodisman v. Lytle, 724 F.2d 818, 820-21 (9th Cir.1984); Kilcoyne v. Morgan, 664 F.2d 940, 942 (4th Cir.1981), cert. denied, 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982).
 
 
 50
 In the Varma case, as in the Kovats case, the merits issue is intertwined with the qualified immunity issue. Without findings by the district court, it is difficult to ascertain whether Varma's claim falls under traditional constitutional principles or merely states a claim for breach of contract. For example, the Supreme Court has made clear that promises of specific procedures do not create interests protected by the Due Process clause. See Olim v. Wakinekona, 461 U.S. 238, 250 & n. 12, 103 S.Ct. 1741, 1748 & n. 12, 75 L.Ed.2d 813 (1983) ("expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause"). Following Olim, it appears that Varma's claim would have to be based on more than the regulations setting out procedures for tenure evaluations.
 
 
 51
 It may be that Varma will be able to find support for her claim in some other doctrinal source. Until the district court determines whether there is any property right, as alleged by Varma, it will not be possible to determine whether that right was clearly established. In the procedural posture of this case, we will not speculate on the validity of Varma's merits claim. We hold merely that because the merits claim is inseparable, at least at this juncture, from the qualified immunity issue, the district court did not err in denying the motion of the individual Rutgers defendants for summary judgment on the qualified immunity doctrine.IV.
 
 Conclusion
 
 52
 For the reasons set forth above, we will remand this case to the district court for further proceedings.
 
 
 53
 SCIRICA, District Judge, concurring.
 
 
 54
 I write separately to emphasize the basis for my decision to bar Rutgers from asserting Eleventh Amendment immunity.
 
 
 55
 As the majority observes, our Eleventh Amendment inquiry will vary depending on the unique existence and peculiar circumstances of each state-affiliated entity. See Maj. op. at 1313-1314 (citing Soni v. Board of Trustees of the University of Tennessee, 513 F.2d 347, 352 (6th Cir.1975), cert. denied, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976)). Thus, the state attributes of other entities may differ significantly from those of Rutgers.
 
 
 56
 I agree that with respect to Rutgers, New Jersey is not the "real, substantial party in interest." See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). I believe, however, that New Jersey's discretionary power to fund Rutgers is not a significant or dispositive factor in today's inquiry.
 
 
 57
 The majority states that "[a]ny increase in Rutgers' state appropriation as a result of a judgment against Rutgers will be entirely the result of discretionary action by the state." Maj. op. at 1309. This view fails to accord proper weight to the practical reality of the state's tie to Rutgers. To be sure, Rutgers has independent funding sources. Nevertheless, Rutgers is an integral part of New Jersey's public education system and either directly or indirectly the state will ensure the university's fiscal stability. For example, it is unlikely that New Jersey would allow a substantial judgment against Rutgers to jeopardize the University's well being.
 
 
 58
 This court recently addressed a similar situation involving a mix of public and independent funding for the Pennsylvania State System of Higher Education. See Skehan v. State System of Higher Education, 815 F.2d 244, 248 (3d Cir.1987). In Skehan, however, the court held that under the multi-factor inquiry of Urbano v. Board of Managers of New Jersey State Prison, 415 F.2d 247, 250-51 (3d Cir.1969), cert. denied, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970), the state system was entitled to Eleventh Amendment immunity. See Skehan, 815 F.2d at 249. In reaching its holding, the court acknowledged the discretionary nature of state funding, but emphasized the state's interest in providing an affordable, high quality education to Pennsylvania students. See id. at 248. Thus, in a practical sense, a legislature's funding discretion is tempered by social policy favoring affordable, quality education.
 
 
 59
 Although Skehan and this case involve similar levels of state supervision and control (e.g., gubernatorial appointments and state audits), Rutgers' status differs in other significant respects. In Skehan, Pennsylvania had preserved sovereign immunity for the state system and state colleges. See id. at 248-49. Here, however, New Jersey has immunized itself from judgment against Rutgers, and allowed the university to sue and be sued. Similarly, in Skehan, the state system was governed by the Commonwealth's administrative code, see id. at 248, but in this case, Rutgers is not obligated to follow state civil service, competitive bidding, or administrative procedure requirements. Based on these circumstances, I agree that Rutgers is not an arm of the state for purposes of the Eleventh Amendment. Nevertheless, any Eleventh Amendment inquiry under Urbano involves a dynamic, every-changing process.
 
 
 
 *
 Hon. Anthony J. Scirica of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The Promotions Review Committee concluded:
 The record shows a devoted teacher. However, the candidate's performance does not exhibit the quality of scholarship which would merit promotion and tenure in the responsibilities which have been assigned to her.
 Varma App. (VA) at 250. The Committee reaffirmed its recommendation following reevaluation pursuant to the procedures contained in the collective bargaining agreement between Rutgers and the American Association of University Professors.
 
 
 [2]
 The Kovats plaintiffs rely on a Rutgers regulation stating:
 All full-time faculty appointments or reappointments, after a seven-year period shall be considered to be without limitation of term and the appointee shall hold office indefinitely at the pleasure of the Board of Governors and shall be said to have academic tenure.
 University Regulation 60.1, Kovats App. (KA) at 35. They also rely on a Rutgers policy statement which provides: "There is a provision that an assistant professor who is reappointed after serving the probationary period thereafter enjoys the privilege of tenure." Rutgers Policy with respect to Academic Appointments and Promotions at 4, KA at 138.
 
 
 [3]
 The Kovats matter was before us previously in Kovats v. Rutgers, 749 F.2d 1041 (3d Cir.1984), where we held that the district court had erred in granting Rutgers' motion for summary judgment premised on the res judicata effect of a state court ruling on the exclusivity of the grievance procedure. We held that the state court had not addressed plaintiffs' claim that they had a property interest, and remanded for the district court to "address the property issue." Id. at 1049. Three of the faculty members, Kovats, Tishler and Beck, apparently settled their suits. See id. at 1045 n. 4. Thus, only Procuniar, Davis and Delson are before us now
 
 
 [4]
 The Eleventh Amendment states:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 [5]
 In a prior unrelated case, the same district judge who decided the Kovats decision before us here, applying the nine factor test, determined that Rutgers was entitled to Eleventh Amendment immunity. Miller v. Rutgers, 619 F.Supp. 1386, 1389-92 (D.N.J.1985). That decision was premised in large part on an affidavit by Rutgers' Assistant Vice-President for Budget and Resource Studies indicating that "a judgment would be paid, at least in part, from state appropriations." Id. at 1389
 In Kovats, the court adopted Miller's analysis of the other Urbano factors and premised its contrary conclusion in large part on new financial information provided through affidavits which indicated to the court "that any judgment against [Rutgers] need not be paid from the state treasury." 633 F.Supp. at 1472. On our plenary review, we must review application of all nine criteria to Rutgers.
 
 
 [6]
 The primary affidavits in this case are provided by Marvin W. Greenberg, Rutgers' Senior Vice-President for Program Development, Budgeting and Student Services, KA at 341, and Louis M. Lettieri, Rutgers' Assistant Vice-President and Controller, KA at 474
 
 
 [7]
 A similar confusion is caused by the parties' arguments based on the holdings of Edelman v. Jordan, 415 U.S. 651, 667-68, 94 S.Ct. 1347, 1357-58, 39 L.Ed.2d 662 (1974) (Eleventh Amendment does not bar prospective injunctive relief against state officials even if a necessary ancillary result is increase in spending by state), or Green v. Mansour, 474 U.S. 64, 73-74, 106 S.Ct. 423, 428-29, 88 L.Ed.2d 371 (1985) (Eleventh Amendment bars even retroactive declaratory relief against state officials if not coupled with prospective relief). Those cases address the forms of relief available when it is clear that relief will run against a state; they do not address the preliminary issue of when relief is deemed to run against the state. As to the former issue, whether the primary relief sought is monetary and/or retroactive is conclusive; as to the latter, it is not
 
 
 [8]
 Rutgers' coverage by the Tort Claims Act is not under the definition of "state", which like the Contractual Liability Act excludes entities which can sue or be sued, but by virtue of the definition of "public entities" which is "specifically intended to include" Rutgers. See NJSA 59:1-3 (comment)
 
 
 [9]
 Since the issue of immunity was not before us in Mauriello v. University of Medicine and Dentistry of New Jersey, 781 F.2d 46 (3d Cir.1986), the fact that we addressed the merits can have little bearing on our decision here. Moreover, because the statutes governing UMDJ and Rutgers are not identical, the immunity considerations are not necessarily the same
 
 
 [10]
 In light of our conclusion, we need not reach the plaintiffs' contention that the state has waived its Eleventh Amendment immunity. Our disposition of the Eleventh Amendment issue also disposes of Rutgers' contention that it, its Board of Governors and its Promotion Review Committee are not "persons" subject to suit under 42 U.S.C. Sec. 1983 since public entities not entitled to immunity are considered "persons" subject to Sec. 1983 actions. See Monell, 436 U.S. at 690 & n. 55, 98 S.Ct. at 2035 & n. 55 (1978)
 
 
 [11]
 Because we do not reach the merits, we do not now consider whether Varma's claim implicates our precedent holding that "courts must be vigilant not to intrude into the institutional determination with regard to the evaluation of the performance of the tenure candidate." Gurmankin v. Costanzo, 626 F.2d 1115, 1125 (3d Cir.1980) (citing Kunda v. Muhlenberg College, 621 F.2d 532, 547-48 (3d Cir.1980))